**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo (SBN 144074)
dalekgalipo@yahoo.com
Shannon J. Leap (SBN 339574)
sleap@galipolaw.com
Benjamin S. Levine (SBN 342060)
blevine@galipolaw.com
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
Tel: (818) 347-3333
Fax: (818) 347-4118

Attorneys for Plaintiff Abel Gavia

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABEL GAVIA,<br><br>        Plaintiff,<br><br>     v.<br><br>CITY OF HEMET; COLBY SKAUG; BRANDON SALAZAR; DYLAN DETWILER; BRY MACARTHUR; and DOES 1 through 10, inclusive,<br><br>        Defendants. | **Case No. 5:23-cv-724**<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Fourth Amendment, Unlawful Detention and Arrest (42 U.S.C. § 1983);<br>2. Fourth Amendment, Excessive Force (42 U.S.C. § 1983);<br>3. Fourth Amendment, Denial of Medical Care (42 U.S.C. § 1983);<br>4. Municipal Liability, Unconstitutional Custom or Policy (42 U.S.C. § 1983);<br>5. Municipal Liability, Failure to Train (42 U.S.C. § 1983)<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR DAMAGES

ABEL GAVIA, individually, for his Complaint against Defendants CITY OF HEMET, COLBY SKAUG, BRANDON SALAZAR, DYLAN DETWILER, BRY MACARTHUR, and DOES 1 through 10, inclusive, alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff asserts claims arising under the laws of the United States, including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

2.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.

## INTRODUCTION

3.      This civil rights action seeks compensatory and punitive damages from Defendants for violating various rights under the United States Constitution in connection with their unlawful beating of Plaintiff ABEL GAVIA on April 26, 2021, which caused him serious injury and permanent impairment of his vision, significantly impacting his quality of life.

4.      Plaintiff alleges that the injuries he suffered were the result of the excessive use of force by officers of the Hemet Police Department, including Defendants COLBY SKAUG, BRANDON SALAZAR, DYLAN DETWILER, BRY MACARTHUR, and DOES 1 through 7 (collectively "Defendant officers"); and were also a result of Defendants' failure to provide reasonable medical care to Plaintiff despite Plaintiff's serious medical condition after being severely beaten by the Defendant officers.

5.      The policies and customs behind the uses of excessive force against civilians such as Plaintiff are fundamentally unconstitutional and have violated the civil rights of residents of the CITY OF HEMET, such as Plaintiff. Accordingly, Plaintiff

1  herein seeks by means of this civil rights action to hold accountable those responsible
2  for Plaintiff's injuries and to challenge the unconstitutional policies and practices of
3  the CITY and its policymaking officials.

4  **PARTIES**

5       6.    At all relevant times, Plaintiff ABEL GAVIA ("Plaintiff" or " Mr. Gavia")
6  was an individual residing in the City of Hemet, County of Riverside, California. Mr.
7  Gavia sues in his individual capacity and seeks compensatory and punitive damages
8  under federal law.

9       7.    At all relevant times, Defendant CITY OF HEMET ("CITY") is and was
10 a municipal corporation existing under the laws of the State of California. CITY is a
11 chartered subdivision of the State of California with the capacity to be sued. CITY is
12 responsible for the actions, omissions, policies, procedures, practices, and customs of
13 its various agents and agencies, including the Hemet Police Department ("HPD") and
14 its agents and employees. At all relevant times, Defendant CITY was responsible for
15 assuring that the actions, omissions, policies, procedures, practices, and customs of the
16 and its employees and agents complied with the laws of the United States and of the
17 State of California. At all relevant times, Defendant CITY was the employer of
18 Defendants COLBY SKAUG, BRANDON SALAZAR, DYLAN DETWILER, BRY
19 MACARTHUR, and DOES 1-10.

20      8.    At all relevant times, Defendants COLBY SKAUG ("SKAUG"),
21 BRANDON SALAZAR ("SALAZAR"), DYLAN DETWILER ("DETWILER"), and
22 BRY MACARTHUR ("MACARTHUR") were duly appointed by CITY as HPD
23 officers and employees or agents of CITY, subject to oversight and supervision by
24 CITY's elected and non-elected officials. SKAUG, SALAZAR, DETWILER, and
25 MACARTHUR acted under color of law, to wit, under the color of the statutes,
26 ordinances, regulations, policies, customs, and usages of Defendant CITY and the
27 HPD, and under the statutes and regulations of the State of California. At all relevant
28 times, SKAUG, SALAZAR, DETWILER, and MACARTHUR acted within the course

1   and scope of their employment with the CITY and the HPD.

2   9.   At all relevant times, Defendants DOES 1-7 ("DOE OFFICERS") were

3   duly appointed by CITY as HPD officers and employees or agents of CITY, subject to

4   oversight and supervision by CITY's elected and non-elected officials. DOES 1-7

5   acted under color of law, to wit, under the color of the statutes, ordinances, regulations,

6   policies, customs, and usages of Defendant CITY and the HPD, and under the statutes

7   and regulations of the State of California. At all relevant times, DOES 1-7 acted within

8   the course and scope of their employment with the CITY and the HPD.

9   10.   At all relevant times, Defendants DOES 8-10 were managerial,

10  supervisorial, and policymaking employees of the HPD, who were acting under color

11  of law and within the course and scope of their duties as managerial, supervisorial, and

12  policymaking employees for the HPD. DOES 8-10 were acting with the complete

13  authority and ratification of their principal, Defendant CITY. At all relevant times,

14  DOES 8-10 acted within the course and scope of their employment with the CITY and

15  the HPD.

16  11.   Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and

17  DOE OFFICERS are sued in their individual capacities.

18  12.   In doing the acts and failing and omitting to act as hereinafter described,

19  Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOE

20  OFFICERS were acting on the implied and actual permission and consent of Defendant

21  CITY.

22  13.   The true names and capacities of DOES 1-10 are currently unknown to

23  Mr. Gavia, who otherwise sues these Defendants by such fictitious names. Mr. Gavia

24  will seek leave to amend this Complaint to show the true names and capacities of these

25  Defendants when they have been ascertained. Each of the fictitiously named

26  Defendants is responsible in some manner for the conduct or liabilities alleged herein.

27  14.   At all times mentioned herein, each and every Defendant, including

28  DOES 1-10, was the agent of each and every other Defendant and had the legal duty

to oversee and supervise the hiring, conduct, and employment of each and every Defendant.

15.    All of the acts complained of herein by Mr. Gavia against Defendants were done and performed by said Defendants by and through their authorized agents, servants, and/or employees, all of whom at all relevant times herein were acting with the course, purpose, and scope of said agency, service, and/or employment capacity. Moreover, Defendants and their agents ratified all of the acts complained herein.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

16.    Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 15 of this Complaint with the same force and effect as if fully set forth herein.

17.    Plaintiff ABEL GAVIA is a 57-year-old father of two who suffers from end-stage renal disease (kidney failure) and diabetes. Although he is generally able to maintain good health by receiving dialysis treatment three times per week and by regulating his blood sugar, his blood sugar occasionally drops when he goes without a meal for longer than usual, as is common for individuals with his condition.

18.    On or about the evening of April 26, 2021, Mr. Gavia was driving from Wal-Mart in Hemet, California after having driven there to help his daughter, who had locked her keys in her car.

19.    Sometime between 8:00 and 8:30 p.m., while on his way to a nearby restaurant for a late dinner, Mr. Gavia suddenly began to feel unwell and pulled his car over to the side of the road at or near 1100 E. Menlo Avenue in Hemet, California.

20.    Unbeknownst to Mr. Gavia, Defendant SKAUG had been following his car, based on SKAUG's alleged belief that Mr. Gavia was driving erratically. SKAUG stopped his patrol car behind or near Mr. Gavia's car and, at or around that time, radioed for additional officer support.

21.    On information and belief, Mr. Gavia committed no traffic violations.

22.    Additional officers, including Defendants SALAZAR, DETWILER, MACARTHUR, and DOES 1-7, began to arrive at the location. Defendant SKAUG

exited his patrol car, approached Mr. Gavia's driver-side window, and asked him to step out of his vehicle.

23. With Defendants SKAUG, MACARTHUR, and other officers standing by his driver-side door, Mr. Gavia opened his car door and slowly lowered himself down.

24. As Mr. Gavia was exiting his vehicle, SKAUG and MACARTHUR directed Mr. Gavia to turn around to face his vehicle.

25. As Mr. Gavia turned around and came to face his vehicle, without warning, SKAUG and MACARTHUR grabbed Mr. Gavia and began repeatedly striking him in the face and the side of his head with closed fists, causing Mr. Gavia to fall to his knees, striking them on the pavement before falling to the ground face-down.

26. At all relevant times, Defendants SKAUG, MACARTHUR, SALAZAR, DETWILER, and DOES 1-7 did not have reasonable suspicion to detain or probable cause to arrest Mr. Gavia, but proceeded to arrest Mr. Gavia, nevertheless.

27. As Mr. Gavia lay face-down on the ground, Defendants SKAUG, MACARTHUR, SALAZAR, DETWILER, and DOES 1-7 began pulling his arms behind his back in an effort to handcuff him while pinning him down with their bodyweight, causing him to scrape his face and abdomen on the road.

28. As Defendants SKAUG, MACARTHUR, SALAZAR, DETWILER, and DOES 1-7 handcuffed Mr. Gavia, without probable cause, they continued to escalate the situation despite that at all relevant times, Mr. Gavia was not resisting arrest, nor was he posing any risk of harm to the Defendants or any other person.

29. Prior to, during, and after the arrest, SKAUG punched Mr. Gavia several more times on the arm and/or torso, MACARTHUR punched Mr. Gavia several more times in the face and torso and kicked Mr. Gavia multiple times in the shoulder, and SALAZAR struck Mr. Gavia in the torso multiple times using his knee, all while Mr. Gavia repeatedly cried out loudly in pain. On information and belief, one or more of DOES 1-7 also struck Mr. Gavia as he was being handcuffed while face-down on the

ground. During this time, Defendants SKAUG, MACARTHUR, SALAZAR, DETWILER, and DOES 1-7 continued to press or hold Mr. Gavia down against the ground while pulling his arms behind his back.

30.     As a result of Defendants' beatings, Mr. Gavia sustained serious and visible injuries to his face, eyes, and extremeties. His eye was swollen, his nose and mouth bled, his legs and torso were bruised, several of his teeth were knocked out, and he had difficulty standing on his own when Defendant Officers lifted him from the pavement. Furthermore, Mr. Gavia's symptoms of his hypoglycemia also obviously required immediate medical attention. Nevertheless, without any legitimate reason, Defendant Officers waited several minutes before calling for an ambulace or other medical aid. At no point did SKAUG, MACARTHUR, SALAZAR, DETWILER, or DOES 1-7 ask Mr. Gavia if he had been hurt, provide medical aid, or make any additional effort to help him.

31.     An ambulance arrived at or about 8:36 p.m. and paramedics briefly spoke with officers, who falsely told the paramedics that Mr. Gavia had not been struck in the head, when in fact Defendants SKAUG and MACARTHUR had done so.

32.     The paramedics began to attend to Mr. Gavia and his injuries at or about 8:37 p.m. while the Defendant officers stood nearby. In the presence of the officers, including SKAUG, SALAZAR, DETWILER, and MACARTHUR, Mr. Gavia reported to the paramedics that he was experiencing severe pain in his chest, spine, head, and the right side of his face, and moderate pain in his neck, jaw, and knee. During the same period, the paramedics further observed that Mr. Gavia's mouth and nose were bleeding, that his left eye was bloody and was swelling, and that he had multiple scrapes and bruises on his face and abdomen.

33.     The paramedics then assisted Mr. Gavia onto a gurney and into an ambulance, where they learned that Mr. Gavia's blood-glucose level was 49, an extremely low level. SKAUG entered the ambulance and the paramedics informed SKAUG that Mr. Gavia's severely low blood sugar (hypoglycemia) was likely the

cause of any alleged poor driving SKAUG may have observed. At this time, Mr. Gavia was in a delirious state due to his hypoglycemia and the repeated blows Defendants SKAUG, MACARTHUR, and SALAZAR had delivered to his head and body.

34.     While in the ambulance, the paramedics called the Riverside University Health System ("RUHS") hospital to notify staff that they were bringing Mr. Gavia in for trauma care. However, despite Mr. Gavia's serious medical condition, incapacitation, and urgent need for hospital treatment, SKAUG interrogated Mr. Gavia in the ambulance and did not allow the ambulance to leave the scene of the arrest and beating. SKAUG did not Mirandize Mr. Gavia prior to this interrogation.

35.     After SKAUG had finished interrogating Mr. Gavia, SKAUG called his supervisor, DOE 8, because SKAUG did not know whether or not he should follow the ambulance and meet Mr. Gavia at the hospital. SKAUG then handed the phone to a paramedic to speak with DOE 8, who questioned the paramedic about why Mr. Gavia was being taken to RUHS rather than to another facility. During this period, SKAUG still did not allow the ambulance to leave the scene and bring Mr. Gavia to the hospital.

36.     On information and belief, in this exchange, the paramedic reported to SKAUG that Mr. Gavia's injuries were so significant that he needed to be transported to RUHS, which had a more robust trauma center than other hospitals or medical centers in the area.

37.     Once the phone conversation with DOE 8 ended, SKAUG proceeded to take photographs of Mr. Gavia and his injuries. Only after SKAUG had done so did SKAUG allow the ambulance to leave the scene for the hospital, at or about 9:27 p.m. — approximately 50 minutes after the paramedics began attending to Mr. Gavia.

38.     Approximately 30 seconds after the ambulance left and began transporting Mr. Gavia to RUHS for emergency care, SKAUG pulled the ambulance over, further delaying critical treatment. Realizing he had forgotten to Mirandize Mr. Gavia, SKAUG entered the ambulance and did so, and then began interrogating Mr. Gavia again despite Mr. Gavia's urgent need for medical care.

39.    After SKAUG completed his questioning and allowed paramedics to resume transporting Mr. Gavia to RUHS, the paramedics brought Mr. Gavia to the hospital and transferred him into Emergency Department care at or around 10:25 p.m.

40.    Defendants therefore caused a delay of as long as two hours in Mr. Gavia's receipt of medical care, despite the obvious and urgent need.

41.    At all relevant times, Mr. Gavia complied with Defendant Officers' commands and did not resist arrest.

42.    At all relevant times,  Defendant officers had no information that Mr. Gavia posed any threat of injury to anyone, nor did they have information that Mr. Gavia had actually injured anyone.

43.    Mr. Gavia had in fact, not hurt anyone at any relevant time.

44.    At all relevant times, Defendant officers failed to warn Mr. Gavia that they would begin using force against him, despite it being feasible to do so, and despite Mr. Gavia's compliance with Defendant Officers' commands.

45.    At all relevant times, Mr. Gavia posed no imminent threat of bodily harm to Defendant officers or anyone else.

46.    At all relevant times, Mr. Gavia made no verbal threats to any officer or anyone else.

47.    At all relevant times, Defendants could observe that Mr. Gavia was unarmed and had no weapons in his possession.

48.    At all relevant times, Defendant Officers had no information that Mr. Gavia had committed a crime unrelated to the alleged poor driving SKAUG claimed to have observed.

49.    At all relevant times, Defendant Officers failed to make any effort to ascertain whether Mr. Gavia was suffering from a medical problem or crisis requiring urgent treatment, as was obvious and in fact the case at the time.

50.    At all relevant times, Defendant Officers failed to take steps to de-escalate the situation or give Mr. Gavia the opportunity to cooperate with their instructions or

1  comply with their orders prior to beating and arresting him.

2      51.    As a result of the Defendant officers' repeated strikes to Mr. Gavia's head

3  and body, forcibly bringing Mr. Gavia to his knees and then to the ground, and holding

4  him down against the pavement road using their body weight, Mr. Gavia suffered

5  significant injuries, some of which persist today – nearly two years after the incident.

6  Mr. Gavia suffered numerous scrapes and bruises to his face, neck, chest, abdomen,

7  back, shoulder, upper and lower arms, wrist/hand, knees, shin, and foot, as well as a

8  significant hemmorage to his left eye, resulting in ongoing and possibly permanent

9  vision impairment. Mr. Gavia continues to suffer from persistent pain in his knees.

10      52.    Prior to being beaten by the Defendant officers, Mr. Gavia underwent

11  successful cataract surgeries to both eyes, resulting in clear vision in both eyes for the

12  first time in many years. After the beating, Mr. Gavia's vision in both eyes became

13  blurry and remains blurry today. Since the beating, Mr. Gavia has had and continues

14  to have difficulty focusing his vision and difficulty seeing objects that are more than

15  ten feet in front of him, issues he did not experience after recovering from his surgeries

16  and before the beating. This significant reduction in Mr. Gavia's vision has required

17  him to stop driving, which in turn requires him to rely on family to take him anywhere

18  he needs to go, including to the dialysis treatments he undergoes three times each week

19  and all other routine errands and appointments.

20      53.    In addition to his lasting physical problems, Mr. Gavia was significantly

21  traumatized by the arrest and unjustified beating he experienced and has suffered

22  significant emotional harm, based both on the beating itself and on his apparently

23  permanent loss in vision. Mr. Gavia suffers from continued anguish and distress from

24  memories of the beating, from the loss of independence his lasting injuries have caused,

25  and from being forced to rely on others to perform basic day-to-day tasks he had been

26  able to easily do alone before the beating. As a lasting result of the beating and the

27  injuries he suffered, Mr. Gavia's quality of life has been significantly diminished.

28  ///

## FIRST CLAIM FOR RELIEF

### Fourth Amendment – Unreasonable Search and Seizure – Unlawful Detention and Arrest (42 U.S.C. § 1983)

### Plaintiff ABEL GAVIA against Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7

54.  Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs of this complaint with the same force and effect as if fully set forth herein.

55.  Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 detained Mr. Gavia without probable cause.

56.  When Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 used physical force including beating, punching, and kicking Mr. Gavia in his face, eyes, torso, and extremeties, and then placed Mr. Gavia in hancuffs, they violated Mr. Gavia's right to be secure in his person agaisnt unreasonable searches and seizures as guaranteed to Mr. Gavia under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

57.  At all relevant times, Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 acted under color of state law. Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 had no reasonable suspicion to detain Mr. Gavia and no probable cause to arrest him. In addition to the unjustified and forceful removal of Mr. Gavia from his vehicle being unreasonable, the scope and manner of the detention was unreasonable. It was not necessary to use force against Mr. Gavia by punching, beating, and kicking him as he complied with Defendants' orders. Moreover it was not necessary to continue these uses of physical force after Mr. Gavia was prone, face down, on the ground, and being handcuffed.

58.  The conduct of Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 was done with reckless disregard for the rights and safety of Mr. Gavia and therefore warrants the imposition of exemplary and punitive damages as to Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and

DOES 1-7. As a direct result of the unreasonable detention and arrest, Mr. Gavia experienced severe pain and suffering for which he is entitled to recover damages.

59.     As a result of their misconduct, Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 are liable for Mr. Gavia's injuries, either because they were integral participants in the wrongful detention and arrest, or because they failed to intervene to prevent these violations.

60.     Plaintiff brings this claim and seeks damages on this claim, including for Plaintiff's injuries, including for pain and suffering, emotional distress from his phsycial injuries, humiliation, disfigurement, financial loss, and reduced earning capacity.

61.     Plaintiff also seeks attorney's fees and costs for this claim, pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

**Fourth Amendment - Unreasonable Search and Seizure - Excessive Force**

**(42 U.S.C. § 1983)**

**Plaintiff ABEL GAVIA against Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7**

62.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint with the same force and effect as if fully set forth herein.

63.     Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7's uses of force against Mr. Gavia were excessive and unreasonable under the circumstances. These Defendants encountered Mr. Gavia in the midst of a medical crisis and, instead of providing the assistance he needed, arrested and severely beat him. At the time of the beating, Mr. Gavia offered minimal resistance to the officers, made no attempt to flee, and had committed no serious crime.

64.     These Defendants' uses of force were further excessive in that Mr. Gavia never physically injured them or anyone else before being beaten, never verbally threatened anyone, and never brandished a weapon.

65.     The unreasonable use of force by Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 deprived Mr. Gavia of his right to be secure in his person against unreasonable searches and seizures as guaranteed to Mr. Gavia under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

66.     As a result, Mr. Gavia suffered severe pain and suffering and long-term, potentially permanent impairment of his vision. Defendants are therefore liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

67.     As a result of Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7's conduct, they are liable for Mr. Gavia's injuries, either because they were integral participants in the use of excessive force, or because they failed to intervene to prevent these violations.

68.     The conduct of Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Mr. Gavia and therefore warrants the imposition of exemplary and punitive damages as to these Defendants.

69.     Plaintiff brings this claim and seeks damages on this claim, including for Plaintiff's injuries, including for pain and suffering, emotional distress from his phsycial injuries, humiliation, disfigurement, financial loss, and reduced earning capacity.

70.     Plaintiff also seeks attorney's fees under this claim pursuant to 42 U.S.C. § 1988.

## THIRD CLAIM FOR RELIEF

### Fourth Amendment - Denial of Medical Care (42 U.S.C. § 1983)
### Plaintiff ABEL GAVIA against Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-8

71.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint with the same force and effect as if fully set forth herein.

72.     After beating Mr. Gavia and causing him serious injury, Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 did not timely summon or provide timely medical attention for Mr. Gavia, who was bleeding and suffering from a hypoglycemic episode. On information and belief, these Defendants did not immediately summon medical care.

73.     Further, once paramedics arrived at the scene, assisted Mr. Gavia into an ambulance, and were ready to transport him to the hospital, Defendants SKAUG and DOE 8 prevented the ambulance from departing in order to interrogate Mr. Gavia, question the paramedics, and form their own plans unrelated to Mr. Gavia's medical care. In doing so, Defendants SKAUG and DOE 8 delayed the ambulance's departure from the scene by as long as 50 minutes.

74.     Further, shortly after the ambulance departed to transport Mr. Gavia to the hospital, Defendant SKAUG delayed it even further by pulling it over in order to belatedly Mirandize Mr. Gavia and further interrogate him, while Mr. Gavia was bleeding from his nose, mouth, and eye, and was in obvious need of critical medical attention. On information and belief, Defendant SKAUG did so at the express direction of his supervisor, DOE 8.

75.     By delaying the ambulance's departure from the scene, stopping the ambulance shortly after it departed, and further delaying the ambulance's arrival to the hospital, all for the sole purpose of interrogating and Mirandizing Mr. Gavia, Defendants SKAUG and DOE 8 unreasonably delayed important medical care they knew Mr. Gavia urgently needed, both for his hypoglycemia and the injuries sustained from Defendants' uses of force against him.

76.     The denial of medical care by Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-8 deprived Mr. Gavia of his right to be secure in his persons against unreasonable searches and seizures as guaranteed to Mr. Gavia under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

77.     As a result, Mr. Gavia suffered severe pain and suffering and long-term, potentially permanent impairment of his vision. Defendants are therefore liable to Mr. Gavia for compensatory damages under 42 U.S.C. § 1983.

78.     Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-8 knew that failure to provide timely medical treatment to Mr. Gavia could result in further significant injury or the unnecessary and wanton infliction of pain, but disregarded that serious medical need, exacerbating his pain and suffering.

79.     The conduct of Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-8 was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Mr. Gavia and therefore warrants the imposition of exemplary and punitive damages as to these Defendants.

80.     Plaintiff brings this claim and seeks damages on this claim, including for Plaintiff's injuries, including for pain and suffering, emotional distress from his phsycial injuries, humiliation, disfigurement, financial loss, and reduced earning capacity.

81.     Plaintiff also seeks attorney's fees under this claim pursuant to 42 U.S.C. § 1988.

**FOURTH CLAIM FOR RELIEF**

**Muncipal Liability for Unconstitutional Custom or Policy (42 U.S.C. § 1983)**

**By Plaintiff ABEL GAVIA against Defendant CITY OF HEMET**

**and DOES 8-10**

82.     Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint with the same force and effect as if fully set forth herein.

83.     At all relevant times, Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 acted under color of law. The acts of these Defendants violated Mr. Gavia's rights under the United States Constitution and the Fourth and Fourteenth Amendment.

84.     On information and belief, DOES 8-10 were final policymakers, acting

under color of law, who had final policymaking authority concerning the acts of SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7, ratifying these Defendants' acts and the basis for them.

85. On information and belief, the CITY made a formal decision that the beating of Mr. Gavia was "within policy" of the CITY's police department protocols, notwithstanding that Mr. Gavia posed no threat of appreciable bodily harm to the Defendant officers or anyone else at the moment he was beaten. This manifests a deliberate indifference to the civil rights of Mr. Gavia and the residents of the CITY.

86. Defendant CITY ratified, acquiesced, and condoned the beating of and use of excessive force against Mr. Gavia by the Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7.

71. On information and belief, Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 were not disciplined, and were not given additional training, after the beating of and use of excessive force against Mr. Gavia, which evidences ratification of and acquiescence in same by CITY.

72. On and for some time prior to April 26, 2021, and continuing to the present date, Defendant CITY deprived Mr. Gavia and other members of the public of the rights and liberties secured to them by the Fourth and Fourteenth Amendments to the United States Constitution, because said Defendants and their supervising and managerial employees acted with gross negligence and with reckless and deliberate indifference to the rights and liberties of the public in general, and of Mr. Gavia and similarly situated persons, by knowingly maintaining, enforcing, and applying the following customs, policies, and practices of:

        a.    Using unreasonable and unnecessary force against members of the public whom HPD officers stop, detain, or arrest, despite such individuals being unarmed, having made no verbal threats to the officers, having made no threatening movements toward the officers, and having offered no or minimal physical resistance to the officers; and

b.  Using unreasonable and unnecessary force against members of the public whom HPD officers stop, detain, or arrest, despite such individuals being unarmed, having made no verbal threats to the officers, having made no threatening movements toward the officers, and having offered no or minimal physical resistance to the officers, specifically through HPD officers' use of blunt objects including fists, knees, elbows, and batons to strike such individuals, and/or by pushing, slamming, or pulling such individuals against vehicles or to the ground and pressing against them with the officers' body weight; and

c.  Using unreasonable and unnecessary force against members of the public during traffic stops conducted by HPD officers, including by unnecessarily escalating stops for minor traffic infractions or misdemeanors into violent altercations resulting in significant injury, where such altercations could readily and feasibly have been avoided through less aggressive and confrontational approaches and by clearly and patiently communicating with stopped individuals rather than by quickly resorting to the use of physical force; and

d.  Using unreasonable and unnecessary force against members of the public whom HPD officers stop, detain, or arrest and who show signs of intoxication, incapacitation, handicap, disability, or a medical condition or crisis affecting their ability to comprehend officers' questions or instructions, communicate with officers in a way the officers can understand, and promptly comply with officers' directions; and, instead of taking these individuals' conditions into account and summoning medical attention where necessary, responding to these individuals' inability to promptly understand and comply with directions by resorting to the use of physical force; and

e.  Failing to institute appropriate policies regarding the use of force against members of the public with whom officers come into contact, stop, detain, or arrest; and

f.  Tolerating and thereby sanctioning violations of policies regarding the use of force against members of the public, whether or not such violations were formally recognized or acknowledged by Defendant CITY, and thereby implicitly communicating to officers that future violations will be tolerated and the policies will not be strictly enforced; and

g.    Employing and retaining individuals as police officers whom Defendant CITY knew or reasonably should have known had dangerous propensities of abusing their authority, mistreating citizens, and using excessive and unnecessary force; and

h.    Failing to properly investigate incidents of excessive use of by HPD officers.

73.    The policies, customs, and practices of Defendant CITY do in fact encourage HPD officers, such as the Defendant officers in this case, to believe that excessive use of force against members of the public is permissible and will be permitted by Defendant CITY.

74.    Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 were aware of the policies, customs, and practices of Defendant CITY, and on the basis of such policies, customs, and practices used excessive force against Mr. Gavia. These policies and customs were the driving force that caused Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 to severely beat Mr. Gavia during his arrest and use other forms of excessive force described in Mr. Gavia's excessive force claim above.

75.    By reason of the aforementioned policies and practices of Defendant CITY, Mr. Gavia was severely and likely permanently injured and was subjected to pain and suffering.

76.    Defendant CITY and DOES 8-10, together with various other officials, whether named or unnamed, had actual or constructive knowledge of the deficient policies, practices and customs alleged in the paragraphs above. Despite having such knowledge, Defendant CITY condoned, tolerated, perpetuated, and through actions and inactions ratified such policies. Defendant CITY also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Mr. Gavia and other individuals similarly situated.

77.    The following are only a few examples of the many cases in which HPD officers engaged in unlawful and unconstitutional conduct, the repeated and pervasive

nature of which demonstrates the existence of the policies, customs, and practices listed above. On information and belief, the HPD officers responsible were not disciplined, reprimanded, retained, suspended, or otherwise penalized in connection with the underlying acts described below. The frequency of these and similar events, as well as the lack of corrective action by CITY and HPD officials, demonstrates that the CITY is responsible for the maintenance of these policies, customs, and practices:

a. In *Edmond v. City of Hemet*, in October of 2021, HPD officers encountered the plaintiff in a store parking lot, where he was allegedly panhandling, and asked him to leave, which the plaintiff did. After the plaintiff and the officers returned, the plaintiff began to again comply with the officers' commands, and the officers grabbed him, punched him in the face, forced him to the ground, and restrained him. The case resolved following a six-figure settlement before litigation.

b. In *Hereford v. City of Hemet*, No. 5:22-cv-00394-JWH-SHK, in March of 2021, HPD officers stopped one of the plaintiffs while he was in his parked car in front of his fiancée's home, and arrested him for driving with an allegedly suspended license. The officers then began searching his car, which his fiancée and her daughter began to film. The officers responded by threatening his fiancée and her daughter with arrest, knocking the daughter's phone out of her hand, striking the fiancée, and causing her a variety of injuries in hear head, neck, shoulder, and back. On information and belief, this case is currently in litigation in federal district court.

c. In *Mendoza v. City of Hemet*, No. 5:21-cv-01134-JGB-SHK, in May of 2020, the plaintiff — a small woman in shorts and a t-shirt — was stopped while driving by HPD officers. Seven officers drew their weapons and shouted commands, and the plaintiff complied with their orders to exit her vehicle and turn around. As she did so, she was knocked to the ground

19

by the officers who then used their body weight to press her down onto the ground while arresting her. The case resolved following a six-figure settlement.

d. In *Lagafoged v. City of Hemet*, No. 5:19-cv-00903-SVW-SHK, in August of 2018, HPD officers encountered the plaintiff behaving erratically while standing on a balcony and swinging a stick in the air. The officers responded by releasing a K-9 dog to bite the plaintiff before tasing him multiple times and hogtieing him, resulting in his death. The case resolved following a six-figure settlement.

e. In *Acosta v. City of Hemet*, No. 5:19-cv-00779-CJC-GJS, in May of 2018, HPD officers encountered the plaintiff in a truck near a business at which an alarm was going off. The officers saw the plaintiff begin slowly driving away, at which point one officer fired ten rounds at the plaintiff's truck. Another officer then intentionally crashed his vehicle into the plaintiff's truck, causing it to strike a pole. When the plaintiff exited the truck unarmed and began to run with his hands raised, a third officer shot him multiple times, including in the back, without warning. The case resolved following a seven-figure settlement.

f. In *Martin v. City of Hemet*, No. 5:18-cv-02377-JGB-KK, in October of 2017, the plaintiff was stopped by officers in a parking lot while his wife was in her car nearby. When the plaintiff began to walk away from the officers and his wife, the officers commanded him to drop a small pocket knife he was holding, and the plaintiff put his hands above his head. With the plaintiff's hands raised and visible, two HPD officers fired seven to ten shots at him, killing him. The case resolved following a six-figure settlement.

78. On information and belief, the frequent recurrence of incidents similar to those experienced by Mr. Gavia, including those described above, have led the HPD

and its officers to develop a reputation in the local community for being "rough" and using unnecessary force during arrests and other encounters with members of the public.

79. The frequent recurrence of incidents similar to those experienced by Mr. Gavia, including those described above, is particularly significant and indicative of the unlawful policies, practices, and customs alleged above given the small size of the HPD, which employs only about 90 sworn officers, inclusive of HPD leadership.

80. The policies, practices, and customs implemented and maintained and still tolerated by Defendant CITY and DOES 8-10 were affirmatively linked to and were significantly influential force behind the injuries Mr. Gavia suffered.

81. Accordingly, Defendant CITY and DOES 8-10 are liable to Mr. Gavia for compensatory damages under 42 U.S.C. § 1983.

82. Plaintiff brings this claim and seeks damages on this claim, including for Plaintiff's injuries, including for pain and suffering, emotional distress from his phsycial injuries, humiliation, disfigurement, financial loss, and reduced earning capacity.

83. Plaintiff also seeks statutory attorney fees under this claim pursuant to 42 U.S.C. § 1988.

## FIFTH CLAIM FOR RELIEF

### Municipal Liability – Failure to Train (42 U.S.C. § 1983)

### By Plaintiff ABEL GAVIA against Defendant CITY OF HEMET and DOES 8-10

84. Plaintiff repeats and realleges each and every allegation in the foregoing paragraphs of this Complaint with the same force and effect as if fully set forth herein.

85. At all relevant times, Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 acted under color of law. The acts of these Defendants violated Mr. Gavia's particular rights under the United States Constitution.

86.     The training policies of Defendant CITY were not adequate to train HPD officers to handle the usual and recurring situations with which they must deal.

87.     Defendant CITY was deliberately indifferent to the obvious consequences of their failure to train their officers adequately.

88.     The negligent and unjustified use of force by Defendants SKAUG, SALAZAR, DETWILER, and MACARTHUR against Mr. Gavia was a result of the negligent training by Defendant CITY, which failed to train its officers as to proper police tactics, proper use of force, and proper detention and arrest procedures.

89.     Defendant CITY was responsible for the training of HPD officers to ensure that the actions, procedures, and practices of HPD officers complied with Peace Officer Standards and Training (POST) training standards regarding proper police tactics, proper use of force, and proper detention and arrest procedures, but negligently failed to do so. POST was established by the California Legislature in 1959 to set minimum training standards for California police officers.

90.     The training policies of the CITY were deficient in the following ways:

a.     The CITY failed to properly train HPD officers to, when conducting traffic stops or otherwise interacting members of the public who are behind the wheel of an automobile, assess whether the individuals with whom they come into contact may be impaired in their ability to comprehend officers' questions and orders, to promptly comply with same, and/or to fully control their movements due to potential medical issues (as Mr. Gavia was suffering from here), handicap, disability, or intoxication.

b.     The CITY failed to properly train HPD officers so that officers do not escalate their interactions with residents and do not overreact and resort to use of significant force when use of such force, or of any force at all, was not necessary and where there is no imminent risk of non-*de minimis* physical harm to themselves or others.

c.     The CITY failed to properly train HPD officers to properly and adequately assess the need to use force against members of the public whom they come into contact, detain, or arrest, and, where

some degree of force reasonably appears necessary, to properly and adequately assess the degree of force to use.

d.  The CITY failed to properly train HPD officers so that officers do not permit fear to reach the point of becoming unreasonable fear, thereby resulting in uses of force that cause serious injury to residents, such as Mr. Gavia.

e.  The CITY failed to properly train HPD officers in proper police tactics, such as situational awareness. Because of this lack of proper training by the CITY, the Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7 did not use proper police tactics in handling of the contact with Mr. Gavia, and instead used defective police tactics, including the lack of a situational awareness by the said Defendants.

f.  The CITY failed to properly train HPD officers, such as Defendants herein, in the importance of effective communication prior to using force. Because of the lack of proper training by the CITY, said Defendants did not use effective communication prior to and during the use of force against Mr. Gavia.

91.  The failure of Defendant CITY to provide adequate training caused the deprivation of Mr. Gavia's rights by Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, and DOES 1-7; that is, Defendant CITY's failure to train is so closely related to the deprivation of Mr. Gavia's rights as to be the moving force that caused the ultimate injury.

92.  The following are only a few examples of the many cases in which HPD officers engaged in unlawful and unconstitutional conduct, the repeated and pervasive nature of which demonstrates the various failures by Defendant CITY to provide HPD officers proper training in the areas listed above. The frequency of these and similar events demonstrates that these incidents and that which is the subject of this action are attributable to the CITY's failure to properly train HPD officers:

a.  In *Edmond v. City of Hemet*, in October of 2021, HPD officers encountered the plaintiff in a store parking lot, where he was allegedly panhandling, and asked him to leave, which the plaintiff did. After the plaintiff and the officers returned, the plaintiff began to again comply

with the officers' commands, and the officers grabbed him, punched him in the face, forced him to the ground, and restrained him. The case resolved following a six-figure settlement before litigation.

b. In *Hereford v. City of Hemet*, No. 5:22-cv-00394-JWH-SHK, in March of 2021, HPD officers stopped one of the plaintiffs while he was in his parked car in front of his fiancée's home, and arrested him for driving with an allegedly suspended license. The officers then began searching his car, which his fiancée and her daughter began to film. The officers responded by threatening his fiancée and her daughter with arrest, knocking the daughter's phone out of her hand, striking the fiancée, and causing her a variety of injuries in hear head, neck, shoulder, and back. On information and belief, this case is currently in litigation in federal district court.

c. In *Mendoza v. City of Hemet*, No. 5:21-cv-01134-JGB-SHK, in May of 2020, the plaintiff — a small woman in shorts and a t-shirt — was stopped while driving by HPD officers. Seven officers drew their weapons and shouted commands, and the plaintiff complied with their orders to exit her vehicle and turn around. As she did so, she was knocked to the ground by the officers who then used their body weight to press her down onto the ground while arresting her. The case resolved following a six-figure settlement.

d. In *Lagafoged v. City of Hemet*, No. 5:19-cv-00903-SVW-SHK, in August of 2018, HPD officers encountered the plaintiff behaving erratically while standing on a balcony and swinging a stick in the air. The officers responded by releasing a K-9 dog to bite the plaintiff before tasing him multiple times and hogtieing him, resulting in his death. The case resolved following a six-figure settlement.

e. In *Acosta v. City of Hemet*, No. 5:19-cv-00779-CJC-GJS, in May of 2018, HPD officers encountered the plaintiff in a truck near a business at which an alarm was going off. The officers saw the plaintiff begin slowly driving away, at which point one officer fired ten rounds at the plaintiff's truck. Another officer then intentionally crashed his vehicle into the plaintiff's truck, causing it to strike a pole. When the plaintiff exited the truck unarmed and began to run with his hands raised, a third officer shot him multiple times, including in the back, without warning. The case resolved following a seven-figure settlement.

f. In *Martin v. City of Hemet*, No. 5:18-cv-02377-JGB-KK, in October of 2017, the plaintiff was stopped by officers in a parking lot while his wife was in her car nearby. When the plaintiff began to walk away from the officers and his wife, the officers commanded him to drop a small pocket knife he was holding, and the plaintiff put his hands above his head. With the plaintiff's hands raised and visible, two HPD officers fired seven to ten shots at him, killing him. The case resolved following a six-figure settlement.

93.    The failures by Defendant CITY to properly train HPD officers were affirmatively linked to and were significantly influential force behind the injuries Mr. Gavia suffered.

94.    Accordingly, Defendant CITY and DOES 8-10 are liable to Mr. Gavia for compensatory damages under 42 U.S.C. § 1983.

95.    Plaintiff brings this claim and seeks damages on this claim, including for Plaintiff's injuries, including for pain and suffering, emotional distress from his phsycial injuries, humiliation, disfigurement, financial loss, and reduced earning capacity.

96.    Plaintiff also seeks statutory attorney fees under this claim pursuant to 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ABEL GAVIA requests entry of judgment in his favor and against Defendants SKAUG, SALAZAR, DETWILER, MACARTHUR, CITY OF HEMET, and DOES 1-10, inclusive, as follows:

A.  For compensatory damages in an amount according to proof at trial;

B.  For other general damages in an amount according to proof at trial;

C.  For other non-economic damages in an amount according to proof at trial;

D.  For other special damages in an amount according to proof at trial;

E.  For punitive damages against the individual defendants in an amount to be proven at trial;

F.  Attorney's fees pursuant to 42 U.S.C. § 1988;

G.  For interest;

H.  For reasonable costs of this suit; and

I.  For such further other relief as the Court may deem just, proper, and appropriate.

DATED: April 24, 2023          **LAW OFFICES OF DALE K. GALIPO**


By:  __*/s/ Dale K. Galipo*_____
DALE K. GALIPO
SHANNON J. LEAP
BENJAMIN S. LEVINE
Attorneys for Plaintiff

## **DEMAND FOR JURY TRIAL**

The Plaintiff named herein hereby demands a trial by jury.

DATED: April 24, 2023        **LAW OFFICES OF DALE K. GALIPO**


                              By: __/s/ Dale K. Galipo_____
                                  DALE K. GALIPO
                                  SHANNON J. LEAP
                                  BENJAMIN S. LEVINE

                                  Attorneys for Plaintiff

COMPLAINT FOR DAMAGES